Filed 8/21/25  L.L. v. J.L. CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| L.L.,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>J.L.,<br><br>    Defendant and Respondent. | G064080<br><br>(Super. Ct. No. 22P000531)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Stephen T. Hicklin, Judge. Affirmed.

L.L., in pro. per., for Plaintiff and Appellant.

No appearance by Defendant and Respondent.

This case comes to us following a bench trial on appellant L.L.'s petition for a restraining order against respondent J.L., her long-time domestic partner.[1] Appellant contends the trial court abused its discretion in denying her petition and her motion for a new trial. She also challenges the court's decision to twice sanction her during the course of those proceedings. We affirm in all respects.

FACTUAL AND PROCEDURAL BACKGROUND

Although the parties were never married, they lived together for 11 years and had four children before separating in May 2022. The following month, appellant petitioned to establish paternity and requested orders regarding custody and support. The parties agreed that pending resolution of those matters, appellant would have primary custody of the children at the family residence, and respondent would be allowed to visit the children there twice a week. The parties also came to a temporary agreement on child support. Despite their ability to work out those issues, however, the case quickly devolved into a contentious dispute.

In August 2022, respondent filed an ex parte request for a domestic violence restraining order (DVRO) against appellant, which was denied. Then appellant turned around and filed the same request against respondent the following month. That request also was denied. But as the case proceeded, appellant filed a second DVRO petition in July 2023, based on respondent's alleged harassment, intimidation and threats. The basis for the suit was twofold. First, appellant believed J.L.'s employer, Kaiser, had failed to take sufficient action in response to her allegation that respondent

_____

[1] At trial, both parties were represented by counsel, but in this appeal, appellant is representing herself, and respondent has not appeared or filed a responsive brief.

was using Kaiser's equipment for his personal use.[2] Second, appellant was upset that respondent and Kaiser seemed to be ignoring her repeated demands to remove her from respondent's health care plan. In the lawsuit, appellant also accused respondent and his coworkers of spreading false rumors about her. The record does not reveal what became of that lawsuit.

In response to the DVRO petition, respondent denied all allegations of domestic violence. His attorney also filed a motion for $5,000 in sanctions against appellant, on the grounds appellant's petition was frivolous and appellant had substantially increased respondent's attorney's fees and costs by continuously ignoring the parties' temporary agreements and refusing to engage in reasonable efforts to resolve their disputes.

In November 2023, appellant filed a declaration accusing respondent of failing to fulfill his child support obligations. She further alleged: "Respondent and his attorney thrive on their continued attacks on me. The lies and retaliation from [r]espondent [are] unbelievable and no one should have to go through what I have been through."

During a subsequent status conference, Judge Yolanda V. Torres informed the parties the trial on appellant's DVRO petition would take place first, with a separate trial on the underlying custody and support issues to follow. The DVRO trial commenced before Judge Stephen T. Hicklin on December 18, 2023. That day, appellant took the stand and accused respondent of a broad array of harassment and abuse.

<u>Phone Incident</u>: Appellant testified that on her birthday in 2019, respondent got upset and grabbed her phone from her. She tried to get it

---

[2] The equipment in question was some laptop computers that respondent had brought home for the parties' children to use.

back, but he would not give it to her. The next morning, respondent stomped around the house slamming doors. Appellant suspected he was angry because he thought she was being unfaithful.

Bike Incident: In May 2020, appellant and respondent were at a neighborhood party with their children. At one point, respondent took their then four-year-old son La.L. for a ride on a child's bike. When they returned to the party, La.L. was crying, and his foot was swollen and bleeding. La.L. reached out to appellant for comfort, but respondent held onto him and pushed appellant to the ground when she tried to take the boy. After that, respondent wanted to drive the family home, but thinking he was drunk, appellant drove the children home herself.

Christmas Party Incident: In December 2021, the parties were at a bar celebrating the holidays with friends when respondent grabbed appellant by the arm and took her outside. Appellant did not want to leave the party, but respondent called for an Uber to take them home. When the driver arrived, respondent made appellant get in his car, but she promptly exited the other side of the vehicle and returned to the party, and respondent ended up going home by himself.

Road Rage: A few weeks later, respondent was driving appellant and the children on the freeway when another car cut in front of them. Respondent reacted angrily by swearing at the driver and tailgating him at high speed. Appellant had to ask respondent several times before he finally slowed down and resumed his normal driving.

Appellant testified such road rage incidents were not uncommon while she was living with respondent. She tried to talk to him about his aggressive driving, but he was unreceptive, and she did not press the issue because he was ill-tempered and would often yell at her and their children.

According to appellant, respondent also had a lot of anxiety and would "disengage" and "disappear" at times. At one point, he did attend some anger management classes to develop better coping skills. But, in appellant's view, the classes only helped for a short time before respondent returned to his old ways.

Kitchen Incident: One day in March 2022, respondent kicked appellant in the back while they were playing around in their kitchen with La.L. Respondent initially shrugged off the incident as a joke, but when he saw appellant was in pain, he admitted kicking her "'pretty hard.'"

Drone Incident: Appellant also described other incidents that allegedly occurred following her separation from respondent in 2022. She testified that one day in September of that year, she heard a loud drone buzzing around her house, which frightened her. Using a tracking device on one of her children's tablet computers, appellant discovered respondent was at a nearby high school at the time. She suspected he was flying the drone, but she never asked him about it because she was too afraid.

Flattened Tires: Appellant also suspected respondent punctured two of the tires on her car while it was parked at the family home in April 2023. Upon discovering the flats, appellant called AAA for assistance, only to learn she was no longer covered on the account she shared with respondent. The car sat in her driveway with two flat tires for several weeks, but respondent never said anything about that when he came over to the house to visit the children.

Air Tag Incident: Around this same time, appellant began receiving notifications about an air tag tracking device that appeared to be located somewhere in her car. She and respondent had purchased several air tags to put in their children's backpacks and to keep tabs on appellant's

elderly mother. But appellant suspected respondent was using the device in her car to track her movements, so she called the police. Officers found the device in the backseat of appellant's car and determined the phone number associated with it matched respondent's phone number. However, no charges were ever filed in connection with this incident, and appellant never brought it up with respondent.

Therapy Incident: This incident involved the parties' youngest child, Li.L., who is autistic and undergoes regular treatment for his special needs. One day in the fall of 2023, appellant brought him to a therapy clinic for his scheduled appointment. Although respondent was authorized to be involved in Li.L.'s therapy, he was not scheduled to be at the clinic that day. As appellant was about to enter the clinic with Li.L., respondent jumped out at her in the doorway and began screaming at her so loudly that Li.L. put up his hands in fright. Appellant was scared, too. She asked respondent to step aside, but he refused, so she left the clinic with Li.L. and drove home.

In addition to these specific incidents, appellant testified that respondent used their home security system to record and spy on her when she was at home with the children. But when respondent came over to the house for visitation, he would disconnect the system so appellant could not see what was going on. Appellant also accused respondent of recording their phone calls without her consent, barraging her with unwanted text messages, and harassing her through the court's authorized email system. And she alleged that respondent once neglected to treat a burn that their son, Lu.L., suffered when he spilled hot soup on himself.

Although appellant believed respondent had unresolved anger and mental health problems, she insisted she had no such issues. She did admit, however, that she was dramatic and emotional sometimes, due to

6

everything respondent has put her through. She also admitted doing some things to respondent that could be considered provocative.

For example, one day while respondent was at the family residence visiting the children, appellant had his car towed away from the front of the house. Although the car was respondent's primary vehicle, appellant testified she was worried about potential liability because the car was registered in her name.

Appellant also admitted she threatened to report respondent to the authorities for committing social security fraud. She said she made the threat to pressure respondent to settle her custody and support claims because she wanted the case to be over with.

Regarding the Kaiser lawsuit, appellant said the action was not intended to harm respondent. Rather, appellant feared she would somehow get in trouble if respondent let their children use Kaiser's laptops and if he did not remove her from Kaiser's health care plan.

During cross-examination, appellant admitted that when she filed her first DVRO petition against respondent in 2022, she did not mention many of the incidents she testified about in this case. She also conceded that none of those incidents appear in the report of Dr. Keith Peterson, a psychologist who was appointed in the underlying custody dispute to evaluate the parties pursuant to Evidence Code section 730.[3]

Appellant testified she did in fact tell Dr. Peterson about those incidents. She also took issue with Dr. Peterson's finding that she was trying to make respondent look bad in order to get custody of their children. And

_____

[3] Dr. Peterson's report was admitted into evidence at trial pursuant to the parties' stipulation, but he was not called as a witness by either side.

although Dr. Peterson found appellant had a poorly developed conscience and fluctuating ethical standards, appellant insisted respondent was the one who possessed those traits, not her.

On the second day of trial, respondent testified to a very different version of events. He admitted he has had anger issues in the past, which is why he took the anger management classes. He also said he saw a psychologist and went on disability to deal with his stress when he was living with appellant. While admitting he still gets angry sometimes, respondent credited those measures with teaching him to cope with stressful situations and keep his temper under control.

As for appellant's various allegations, respondent denied grabbing her phone during the birthday incident, pushing her or being drunk during the bike incident, or grabbing her arm and forcing her to leave the Christmas party. He also denied appellant's road rage allegations and kicking her during the kitchen incident, saying he only "play slap[ped]" her softly as a part of a game they were playing with La.L. And respondent denied flying a drone over appellant's house, flattening her tires, planting an air tag tracker in her car, or jumping out and screaming at her during the therapy incident.

Respondent did admit recording appellant through their home security system for a short period of time after they initially separated, but he said that was only because she was being extremely hostile to him. In fact, he said appellant's actions in suing his employer, towing his car, and threatening to report him to social security have caused him severe emotional distress, and if he could afford to do so, he would bring a DVRO petition against her. However, due to all the attorney's fees he has had to pay to defend appellant's numerous legal filings, he cannot afford to seek such relief.

In ruling on appellant's DVRO petition, the trial court found that neither she nor respondent was "entirely straightforward" in their testimony. The court also said it could understand why they both might have some anger issues, given all they have been through. However, the court found most of appellant's allegations were based on speculation and innuendo, and she had failed to prove by a preponderance of the evidence that respondent had subjected her to domestic violence. It therefore denied her petition.

The trial court then turned to respondent's sanctions request, which, as noted above, was filed in a separate motion in conjunction with his initial response to appellant's petition. After finding appellant was given notice of and an opportunity to be heard on the motion, the court sanctioned her $4,500 on the basis she filed her DVRO petition for an improper purpose. In that regard, the court found the petition was part of a "long history of litigation" appellant had pursued, not to protect herself and her own interests, but to harass and injure respondent.

In sanctioning appellant, the court also found she had not been entirely candid in the income and expense statements she had filed with the court. In light of appellant's testimony that she lived in a "very affluent neighborhood" and owned several rental properties, the court was concerned she had underreported her assets and income in her filings.

In the wake of the trial court's rulings, appellant filed a motion for a new trial on her own behalf. In the motion, appellant alleged the court erred by considering Dr. Peterson's report without giving her a chance to question him about it and failing to clear the courtroom before allowing confidential aspects of the report to be divulged during the trial. Appellant also claimed there was insufficient evidence to support the court's decision to deny her petition.

At the motion hearing, appellant appeared in propria persona. The trial court found she had voluntarily stipulated to the admission of Dr. Peterson's report and, by failing to subpoena him as a witness, had waived her right to question him at trial. Additionally, the court noted for the record that the only spectator at the trial was a support person whom appellant had personally invited to attend. The court stated it would have been happy to have that person step out into the hallway while Dr. Peterson's report was being discussed, but appellant never made that request. Therefore, appellant invited any confidentiality lapses that occurred with respect to the report.

The court also rejected appellant's challenge to the sufficiency of the evidence. Although appellant argued her version of events was more believable than respondent's, the court found her testimony lacked credibility in multiple respects. It also determined that some of the things appellant accused respondent of doing did not rise to the level of domestic violence. For instance, while appellant made much of the fact respondent recorded her in her home, the court found that was not improper because the recording was incidental to the parties' home security system, which respondent had legitimate access to. And beyond that, respondent testified he had stopped recording appellant altogether, and the court found his testimony to be credible on that issue.

Overall, the court determined appellant did not come "anywhere close" to meeting her burden of proof at trial. In addition, the court found appellant failed to show she would have obtained a more favorable result had the errors she complained of not occurred. It therefore denied her motion for a new trial.

During the hearing, appellant also challenged the trial court's decision to sanction her $4,500, arguing the income and expense statements

10

the court relied on to impose that sanction were outdated. However, the court found that even if that were true, the statements were inconsistent with other documents appellant had filed in connection with the case, which the court found problematic. Irrespective of that, the court determined the sanction award against appellant was justified because her DVRO petition was "abusive and without merit" and filed for the purpose of "delay or harassment."

The trial court felt the same way about appellant's new trial motion, which is why it entertained respondent's request for additional sanctions against appellant in the amount of $10,000. Appellant objected on the basis the additional sanctions request was made in response to her new trial motion, as opposed to in a separate noticed motion. Appellant also argued the response itself was late because it was not filed within 10 days of her motion.

However, the trial court ruled the response was timely and, even if it were not, the court would exercise its discretion to consider it. Although the court noted respondent's $10,000 request was "a little high," it sanctioned appellant an additional $5,000 on the basis that her filings were intended to punish respondent.

Appellant timely appealed the orders denying her DVRO petition and her motion for a new trial.

## DISCUSSION

Appellant mounts a multi-pronged attack on the trial court's orders. Her two main arguments are: (1) the court "ignored the evidence and misapplied the law," and (2) the court violated her "due process right to a fair and impartial decisionmaker." (Boldface omitted.) Within each of those broader headings, appellant raises multiple sub-arguments, including one

11

aimed at the propriety of the court's sanctions awards. For the reasons explained below, we affirm the court's orders.

## I.

### THE TRIAL COURT DID NOT IGNORE THE EVIDENCE
### OR MISAPPLY THE LAW

Although appellant does not frame them as such, her arguments are geared primarily toward the sufficiency of the evidence to support the trial court's decisions. She faults the court for not accepting her version of events and ruling in her favor, but she fails to recognize that, as a reviewing court, we must defer to the trial court when it comes to judging credibility and weighing the facts.

### A. *Appellant's Brief*

As a preliminary matter, we note appellant's brief does not contain any citations to the record. We recognize appellant is representing herself on appeal, but that does not exempt her from the rules of appellate procedure, including the fundamental tenet that all briefs must contain proper record citations. (Cal. Rules of Court, rule 8.204(a)(1)(C); see generally *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1245–1247 [the law affords pro. per. litigants the same, but no greater, consideration than attorneys].) Although this alone would be sufficient to reject appellant's arguments (*ibid.*), we nevertheless exercise our discretion and, in the interest of justice, consider her claims. (See Cal. Rules of Court, rule 8.204(e)(2)(C).)

### B. *The Law and Standard of Review in DVRO Cases*

To obtain a DVRO, a petitioner has the burden to show by a preponderance of the evidence that he or she has been subjected to "a past act or acts of abuse" by the person to be restrained. (Fam. Code, § 6300, subd. (a);

*In re Marriage of Everard* (2020) 47 Cal.App.5th 109, 122.)[4] In this context, abuse "is not limited to the actual infliction of physical injury or assault" (§ 6203, subd. (b)) but also includes placing a person in "reasonable apprehension of imminent serious bodily injury" (*id.*, subd. (a)(3)) and engaging in behavior that harasses or "disturb[s] the peace of the other party" (§ 6320).

The standard of review in DVRO cases is very deferential, "We may not disturb a court's ruling on a request for a DVRO absent an abuse of discretion. [Citation.] '"The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."'" (*In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780.)

To the extent we are called on to review the trial court's factual findings—whether express or implied—we apply the substantial evidence test. (*In re Marriage of G., supra,* 11 Cal.App.5th at p. 780.) Under that test, "[w]e resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge in all legitimate and reasonable inferences to uphold the finding of the trial court if it is supported by substantial evidence which is reasonable, credible and of solid value." (*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge . . . to determine the credibility of a

---

[4] Unless noted otherwise, all further statutory references are to the Family Code.

witness and the truth or falsity of the facts upon which a determination depends." (*People v. Lyons* (1956) 47 Cal.2d 311, 320.)[5]

*C. Analysis*

Appellant's arguments largely ignore these important principles. In fact, the main theme of her brief is that the trial court failed to give her testimony proper consideration. For example, appellant claims the court ignored her testimony that respondent endangered their children's safety by engaging in multiple episodes of road rage, taking La.L. for a bike ride and injuring him while he was drunk, and failing to attend to a burn Lu.L. suffered when he spilled his soup.

However, respondent denied the road rage allegations, he testified he was not drunk when La.L. injured his foot during their bike ride, and there was no evidence—apart from appellant's bare allegation—he was neglectful in terms of treating Lu.L.'s soup burn. It was up to the trial court to assess the credibility of the evidence on these issues, and we find no reason to second-guess the court's finding that appellant failed to carry her burden of proving her assertions by a preponderance of the evidence.

Likewise, appellant faults the trial court for not believing her testimony regarding the kitchen incident, the therapy incident, and her flattened tries. If, as appellant alleged, respondent had actually kicked her hard in the kitchen, screamed and intimidated her at the therapy clinic, and punctured her car tires, there would be little question she would be entitled to a DVRO. But respondent testified he did not do any of those things. The

---

[5] Although appellant does not provide a separate analysis on the issue, we note the same standard of review also applies to the trial court's decision to deny her new trial motion. (*Minnegren v. Nozar* (2016) 4 Cal.App.5th 500, 514, fn. 7.)

fact the trial court credited respondent's testimony over appellant's testimony is not grounds for reversal.

Appellant suggests the trial court could not properly deny her petition because it found respondent to be "not credible." But that is not what the trial court actually found. In making its ruling, the court determined that neither appellant nor respondent were "entirely straightforward" in their testimony. That simply means the court did not find every aspect of respondent's testimony to be entirely believable. Nonetheless, that did not preclude the court from finding respondent's testimony to be credible as a whole (or at least more credible than appellant's testimony), which the court impliedly did by denying appellant's petition. (See generally *In re Lopez* (2023) 14 Cal.5th 562, 591 [the trier of fact "has wide latitude to believe or disbelieve witnesses, or even specific portions of their testimony, as it sees fit"].)

Appellant also accuses the trial court of dismissing or minimizing some of the things respondent admitted during his testimony, such as yelling and getting angry at times and recording her when they first separated. But both parties admitted getting angry at times during their relationship. Standing alone, occasional expressions of anger generally are not sufficient to justify the issuance of a DVRO. (See generally *State v. Wilmouth* (1997) 302 694 A.2d 584, 586 [domestic violence laws are "not intended to attempt to regulate and adjudicate every loss of temper, angry word, or quarrel between persons connected by a familial relationship"].)

As for respondent's admission he sometimes recorded appellant at the family home, the trial court addressed that issue in denying appellant's new trial motion. As noted above, the court found the recording was not grounds for a DVRO because it was done as part of the parties' home

15

security system, and beyond that, respondent was not doing it anymore. We have no occasion to disturb the court's findings on this issue.

Indeed, those findings prove that, contrary to appellant's contention, the trial court did not "ignore" the evidence. Rather, it carefully assessed the facts in light of the applicable preponderance standard and determined appellant's evidence did not justify a DVRO. Based on our review of the record, there is substantial evidence to support that determination, as well as the court's decision to deny appellant's new trial motion.

## II.
### THE TRIAL COURT DID NOT VIOLATE APPELLANT'S RIGHT TO A FAIR AND IMPARTIAL DECISIONMAKER

*A. Improper Intervention During Questioning*

Appellant accuses the trial court of leading respondent during his testimony. In particular, she cites two instances where the court allegedly interfered in a manner that pressured respondent to "modify his answers to align with the [c]ourt's apparent expectations, undermining the impartiality and fairness of the proceedings."

The first instance of alleged interference occurred while appellant's attorney was cross-examining respondent about his understanding of domestic violence. After respondent admitted not knowing the legal definition of that term, the following exchange occurred:

"Q. Do you consider domestic violence yelling and screaming at [someone]?

"A. No.

"Q. So, in your mind, you have not committed domestic violence, have you?

"A. No.

16

"Q. Okay."

At that point, the court asked respondent, "Just to clarify, you mean, yes, I am confirming I did not commit domestic violence; correct?" After respondent answered, "Yes, Your Honor," appellant's counsel turned to another area of inquiry.

A short time later, the trial judge spoke again after respondent's attorney objected to how appellant's counsel was characterizing respondent's prior testimony. Here is how that colloquy went:

"[Appellant's Attorney] Okay. So you don't recall when the [kitchen incident] occurred, but you do recall slapping [appellant]; correct?

"[Respondent]: I don't recall slapping."

"[Appellant's Attorney]: Do you recall that you testified on direct examination that you slapped her; correct?

"[Respondent's Attorney]: Objection. Misstates the testimony.

"The Court: I don't think that's what he testified to. I think . . . there was testimony about an interaction . . . that involved—

"[The Children's Attorney]: Play slap.

"The Court: —A stage slap or something similar.

"[The Children's Attorney]: Play slap, Your Honor.

"[Appellant's Attorney]: Play slap.

"The Court: Play slap.

"[Appellant's Attorney]: That was the event in the kitchen when you said, I play slapped her?

"The Court: I understand, but you didn't qualify it [at first, counsel]. You said you slapped her. This was a play slap—

"[Appellant's Attorney]: I apologize.

17

"The Court: —that was directed to [appellant], but you can clarify."

After that, appellant's attorney proceeded to ask respondent additional questions about the manner in which he "play slapped" appellant.

The law is clear. Although due process requires a fair trial before a judge with no actual bias against the parties (*People v. Harris* (2005) 37 Cal.4th 310, 346), judges have "both the discretion and the duty to ask questions of witnesses, provided this is done in an effort to elicit material facts or to clarify confusing or unclear testimony." (*People v. Cook* (2006) 39 Cal.4th 566, 597.) In reviewing alleged instances of improper judicial questioning or interference, our task "'is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [a party] a fair, as opposed to a perfect, trial.'" (*People v. Harris, supra*, at p. 347.)

In this case, clearly it did not. With respect to the first instance of alleged interference, the trial court merely clarified respondent's answer to a confusing question about whether he believed he had committed domestic violence. There was nothing wrong with that.

And in the second situation, the trial court clarified what respondent said on direct examination about the kitchen incident, so it could rule on his attorney's objection to how appellant's attorney was characterizing respondent's testimony. Whereas appellant's counsel characterized respondent's prior testimony as an unqualified admission he had slapped appellant, the court clarified that what respondent actually said was he had "play slapped" appellant, which the court rightly viewed as a different matter. The court was within its rights to make inquiry and sort out

18

this issue. Nothing the court did in terms of seeking clarification altered respondent's testimony or violated appellant's fair trial rights.

## B. Disclosing the Contents of Dr. Peterson's Report

Appellant maintains the trial court "biased the hearing" and "compromise[d] trust in the judicial process" by admitting Dr. Peterson's report into evidence and allowing respondent's attorney to question her about its contents. As the parties in family law disputes often do, however, appellant stipulated to undergo an evaluation by an expert appointed under Evidence Code section 730 and to admit the expert's subsequent report into evidence. (See, e.g., *Laborde v. Aronson* (2001) 92 Cal.App.4th 459, 463.) She therefore has no basis to complain that the contents of Dr. Peterson's report were disclosed at trial. (*In re Marriage of Sheldon* (1981) 124 Cal.App.3d 371, 382–384.)

Furthermore, although appellant faults the trial court for not clearing the courtroom before that disclosure occurred, the record indicates the only person in attendance was appellant's designated support person, and appellant did not ask the court to excuse her while Dr. Peterson's report was being discussed. Under these circumstances, appellant forfeited her right to have the contents of the report remain confidential. (See *K.R. v. Superior Court* (2023) 89 Cal.App.5th 1193, 1206, fn. 7 [the forfeiture rule applies to alleged errors that could have been corrected at trial].)

## C. Alleged Ex Parte Communication With Another Judge

As noted above, Judge Torres was assigned to handle appellant's underlying support and custody claims, and Judge Hicklin presided over the trial on appellant's DVRO petition. Appellant alleges Judge Hicklin "colluded with" Judge Torres in making his decision on whether appellant deserved to be sanctioned. Although appellant provides no support for this serious

19

allegation, she claims "[i]t felt like Judge Torres talked to Judge Hicklin or vice versa and they influenced their rulings."

A brief review of events will help put this claim into context. Testimony on the DVRO trial before Judge Hicklin concluded on January 5, 2024. However, closing arguments did not commence until February 8. During that interim period, on January 19, Judge Torres held a hearing on appellant's request for sanctions in the parties' underlying custody and support dispute. At that hearing, Judge Torres not only denied appellant's request but also tentatively sanctioned appellant $3,500 on the ground her request was frivolous.

In discussing appellant's ability to pay that amount, respondent's attorney asserted appellant owned four rental properties and had deposited $1.6 million into her personal bank account in 2023. Appellant disputed she had that much money, but did admit she owned multiple rentals. Judge Torres ultimately decided to defer the sanctions issue until a later date. The record does not disclose what eventually became of that issue, or how the trial on the custody and support issues played out before Judge Torres. As explained above, however, we do know that after that hearing before Judge Torres, Judge Hicklin ruled against appellant on her DVRO petition and sanctioned her for her litigious behavior.

Appellant assumes that, because Judge Torres and Judge Hicklin both referred to appellant's financial situation in deciding whether to sanction her, they must have talked to each other in making their decisions. The assumption is based on appellant's belief that Judge Hicklin had no information about her finances, outside of what was disclosed at the hearing before Judge Torres. That is not borne out by the facts. It is clear from the record that Judge Hicklin had reviewed the income and expense statements

20

that appellant had filed with the court. We therefore find no merit in appellant's claim of judicial collusion.

We also caution appellant against making such unsupported claims in the future. "Impugning the integrity of the trial judge without facts is rarely a good idea [citation], and serious accusations against a trial judge . . . had better be supported by concrete evidence." (*Cornerstone Realty Advisors, LLC v. Summit Healthcare REIT, Inc.* (2020) 56 Cal.App.5th 771, 793.) Appellant has provided no evidence to support her accusations against the trial judge in this case, and we admonish her in the strongest possible terms not to make such baseless claims in any future filings. (*Fink v. Shemtov* (2010) 180 Cal.App.4th 1160, 1176.)

In sum, we are satisfied the hearings on appellant's DVRO petition and her new trial motion were conducted in a fair and impartial manner, and the trial court's rulings on those matters are supported by substantial evidence. There is no basis for us to disturb those rulings.

III.

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION

IN AWARDING SANCTIONS

As noted above, the trial court sanctioned appellant $4,500 at the conclusion of the DVRO trial, and another $5,000 at the hearing on her motion for a new trial. Appellant contends these sanction orders cannot stand because they are procedurally and substantively flawed. We disagree.

A. *The Law and Standard of Review Governing the Trial Court's Sanction Orders*

The statutory basis for the trial court's sanction orders was section 271. Under that statute, the court may sanction a party for conduct that "frustrates the policy of the law to promote settlement of litigation" or

21

"to reduce the cost of litigation by encouraging cooperation between the parties and attorneys." (§ 271, subd. (a).) The statute has been applied in a variety of settings where a party's actions have unnecessarily increased the litigation costs of their opponent. (See, e.g., *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 [§ 271 sanctions appropriate where party's motions "were reckless, baseless and frivolous"]; *In re Marriage of Burgard* (1999) 72 Cal.App.4th 74, 82 [same where party's conduct required his adversary to "respond to an unnecessary motion, to write a brief, to research the law on motions for reconsideration, [and] to appear at yet another hearing"].)

Before imposing sanctions under section 271, however, the court must afford the parties notice and an opportunity to be heard. (*Id.*, subd. (b).) It also must consider the parties' financial circumstances, to avoid imposing an unreasonable financial burden on the party being sanctioned. (*Id.*, subd. (a).)

"We review an award of attorney fees and costs under section 271 for abuse of discretion. [Citation.] 'Accordingly, we will overturn such an order only if, considering all of the evidence viewed most favorably in its support and indulging all reasonable inferences in its favor, no judge could reasonably make the order.'" (*In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 291; see also *Sagonowsky v. Kekoa* (2016) 6 Cal.App.5th 1142, 1152.)

B. *Procedural Argument*

Appellant does not dispute she had adequate notice of respondent's first request for sanctions, which was made in a separate motion and was adjudicated after the trial court denied her DVRO petition. But appellant contends respondent's second request for sanctions was procedurally improper because, rather than being presented in a separate

22

motion, it was made in his opposition to her new trial motion. Consistent with constitutional standards, however, section 271 requires only notice and an opportunity to be heard. (§ 271, subd. (b); see *Mathews v. Eldridge* (1976) 424 U.S. 319, 333 [the cornerstone of due process is notice of the proceedings and an opportunity to be heard in them].) The statute does not require a formal noticed motion prior to the imposition of sanctions. (*In re Marriage of Diamond* (2021) 72 Cal.App.5th 595, 605.)

Considering all the circumstances here, we are satisfied appellant had sufficient notice of possible further sanctions in connection with her new trial motion. Respondent expressly requested additional sanctions in response to appellant's motion; that alone was sufficient notice that sanctions were being sought. (*In re Marriage of Diamond, supra*, 72 Cal.App.5th at p. 605 [by requesting sanctions in her opposition to husband's moving papers, wife satisfied the notice requirement of section 271].)

In addition, appellant had the opportunity to address the sanctions issue in her reply to respondent's opposition papers and at the hearing on her new trial motion. On these facts, the procedural requirements of section 271 and due process were satisfied. (*In re Marriage of Diamond, supra*, 72 Cal.App.5th at p. 605.)

C. *Substantive Argument*

Appellant also challenges both of the trial court's sanction orders on substantive grounds. In her view, the orders are unfair because the court failed to consider the vast array of misconduct she accused respondent of engaging in. This is essentially the same sufficiency-of-the-evidence argument appellant made in attacking the court's orders denying her DVRO petition and her new trial motion. As shown above, there is ample evidence to support those orders. That same analysis applies equally to defeat appellant's

challenge to the court's sanctions orders. Appellant has failed to show the trial court abused its discretion in sanctioning her.

## DISPOSITION

The trial court's orders are affirmed.


GOODING, J.

WE CONCUR:


SANCHEZ, ACTING P. J.


SCOTT, J.